UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
AT LEXINGTON

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>      **Plaintiff,**<br><br>**V.**<br><br>**ERNEST WILLIAM SINGLETON,<br>DOUBLE D HOLDINGS, LLC,<br>S&R MEDICAL ENTERPRISES, LLC,<br>CENTRAL KENTUCKY FAMILY<br>PHARMACY, and<br>GRANT COUNTY WELLNESS CENTER,<br>LLC,**<br><br>      **Defendants.** | **CRIMINAL ACTION NO. 5:13-8-KKC**<br><br><br>**OPINION & ORDER** |

\*\*\* \*\*\* \*\*\*

In June, 2013, the defendants were convicted of number of drug related offenses including conspiracy to knowingly and intentionally distribute and dispense controlled substances outside the scope of professional practice and not for a legitimate medical purpose. These charges stem from the distribution of pain pills, namely oxycodone, through two pain clinics in Georgetown and Grant County, Kentucky. Both clinics were owned and operated by Ernest Singleton.

At the close of the government's evidence and again after the close of all evidence, the defense sought a judgment of acquittal on all counts of the indictment. The Court denied the motions as to all counts except Count 11, on which ruling was reserved. (DE 198, 210). This matter is now before the court on Defendant Ernest William Singleton's post-verdict motion for judgment of acquittal (DE 215) and motion for a new trial (DE 216) brought pursuant to Rules 29 and 33 of the Federal Rules of Criminal Procedure. For the following reasons, the Court will grant in part and deny in part the defendant's motion for acquittal, and deny his motion for a new trial.

**I.**

In 2010, Defendant Ernest William Singleton, a former nurse, opened two pain management clinics, Central Kentucky Bariatric and Pain Management (the "Georgetown clinic") and Grant County Wellness Center (the "Dry Ridge clinic").  Singleton hired and managed the medical, clerical and nursing staff at both clinics, which operated strictly on a cash basis. Initially, Singleton acquired the services of physicians through a locum tenens agency. Later, however, Singleton purchased the locum tenens contracts of two of these doctors, Gregory White and Lea Ann Marlow, who continued to work at the Georgetown and Dry Ridge clinics. Ultimately, both physicians testified against Singleton after pleading guilty to charges of dispensing narcotic pain medication outside the scope of professional practice and not for a legitimate medical purpose.

The government's investigation of the clinics, the physicians and Singleton began in 2011 after law enforcement received complaints about the Georgetown clinic from local pharmacies regarding the nature and quantity of narcotic pain medication being prescribed.  In March, 2013, Singleton and four of his related business entities were indicted on charges of conspiracy to distribute and dispense controlled substances in violation of 21 U.S.C. § 841(a)(1) and § 846; aiding and abetting in distributing and dispensing controlled substances in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2; opening and maintaining a business for the purpose of distributing and dispensing controlled substances in violation of 21 U.S.C. § 856(a)(1); and money laundering and conspiracy to commit money laundering in violation of 18 U.S.C. §§ 1956 and 1957. *See* Second Superseding Indictment dated March 7, 2013 (DE 73).

After a three-week trial, a jury convicted Singleton and the four business entities on all counts. Among the government's witnesses who testified regarding Singleton's role in the offense were several physicians who worked at both clinics pursuant to their contracts with the locum tenens agency. The jury also heard from Doctors Marlow and White, whose locum tenens contracts were

purchased by Singleton and who continued working with Singleton as the clinics grew. Additionally, the jury heard members of both clinics' nursing and clerical staff along with former patients, all of whom testified that Singleton was in charge of both clinics, which treated an inordinately large number of patients exclusively on a "cash only" basis.

DEA Agent Lynn Thompson testified to the presences of "red flags" that led her to investigate Singleton and his clinics. The first red flag consisted of complaints from legitimate pharmacies that stopped filling prescriptions issued at the Georgetown Clinic because of the large number of prescriptions issued to patients who paid cash to the pharmacies. Agent Thompson also testified that patients/patrons of the clinic were "carpooling" to visit the clinics and that all of the individuals in the carpool would receive prescriptions for narcotic pain medications. Paula York with the Kentucky Attorney General's Office of Inspector General also testified about the clinic's practice of accepting only cash for services, which ran from $250–300 per visit. Detective Hector Alcala testified about the use of undercover agents and confidential informants to investigate the clinics. He provided the informants with fictitious MRIs, accompanied them to the clinics for patient visits, and then drove them to a pharmacy to fill the prescriptions issued for narcotics. Detective Alcala utilized various recording devices to capture their office visits on camera. IRS agent Jeff Sagrecy testified the clinics' financial practices and finally, Singleton's Farm Managers, Chad Monroe and David Coulter, also testified regarding their respective roles in helping Singleton to make cash purchases of real estate, vehicles, farm equipment, livestock, feed, and other costly items related to Singleton's farms throughout 2011–2012.

Singleton moved for judgment of acquittal on all counts following the close of the government's evidence and again at the close of all the evidence. The Court reserved ruling on the motion as to Count 11, which charged Singleton with violating 21 U.S.C. § 856(a)(1), and denied it as to all other counts. (DE 210). After the jury was instructed and deliberated, it returned a verdict of

guilty as to all counts. Singleton now brings a renewed motion for judgment of acquittal and a motion for a new trial.

## II.

The Court will turn first to Singleton's motion for acquittal under Rule 29(c). When addressing a motion for judgment of acquittal, the Court must view the evidence in the light most favorable to the prosecution and determine whether there was sufficient evidence offered at trial to convince a rational trier of fact beyond a reasonable doubt that all of the elements of the charged crimes have been established. *United States v. Graham*, 622 F.3d 445, 448 (6th Cir. 2010). The Court is precluded from weighing evidence, considering witness credibility, or substituting its judgment for that of the jury. *United States v. Chavis*, 296 F.3d 450, 455 (6th Cir. 2002). The Court gives the government "the benefit of all inferences which can reasonably be drawn from the evidence, even if the evidence is circumstantial." *United States v. Carter*, 355 F.3d 920, 925 (6th Cir. 2004).

As a threshold matter, the Court will grant the defendant's motion with regard to Count 10, which charged Singleton with violating 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2 by aiding and abetting in the distribution of Ultram. The United States concedes that acquittal is appropriate with regard to Count 10 of the Indictment because Ultram is not a controlled substance under federal law. The motion will therefore be granted.

Singleton and the four corporate entities were charged in Counts 1 and 2 of conspiring together and with others to knowingly and intentionally distribute and dispense controlled II and IV substances outside the scope of professional practice and not for a legitimate medical purpose in Grant and Scott counties all in violation of 21 U.S.C. § 846. Singleton argues he is entitled to judgment of acquittal on these counts because the only evidence presented in support of the existence of an unlawful conspiracy was the testimony of Dr. Lea Marlow, a government

cooperator whose testimony no rational finder of fact could rely upon alone to convict Singleton of the conspiracy charge.

To establish the existence of a conspiracy under 21 U.S.C. § 846 the government is required to prove beyond a reasonable doubt "(1) an agreement to violate drug laws, (2) knowledge and intent to join the conspiracy, and (3) participation in the conspiracy." *United States v. Gibbs*, 182 F.3d 408, 420 (6th Cir. 1999). An agreement to violate the drug laws does not have to be express or formal; it is enough for the government to show a tacit or mutual understanding among the parties. *United States v. Caver*, 470 F.3d 220, 233 (6th Cir. 2006). "But the evidence must [ ] demonstrate that the defendant had knowledge of the conspiracy's object and consciously committed himself to the furtherance of that object." *Id*. While the government must prove the existence of the conspiracy beyond a reasonable doubt, the defendant's connection to the conspiracy need only be slight. *Gibbs*, 182 F.3d at 422.

Viewing the evidence in the light most favorable to the prosecution, the Court finds that "a reasonable mind" could conclude Singleton was guilty beyond a reasonable doubt. *United States v. Davis*, 981 F.2d 906, 908 (6th Cir. 1992). A number of physicians who worked at the clinics testified as to the method and manner in which prescriptions were written at the clinic. In particular, the jury heard direct evidence from Doctors White and Marlow who testified about Singleton's knowledge and direction of their own illegal prescribing practices at the clinics.

In his motion, Singleton maintains that Dr. White "testified that, although he and Mr. Singleton did have an agreement to see more patients, they did *not* have any sort of agreement to prescribe controlled substances to them." (DE 215-1, at 3). Because of this, Singleton contends that "the government's entire case with respect to the Conspiracy Counts rests entirely on Dr. Lea Marlow's testimony," which is not credible. (DE 215-1, at 4). Assessing the credibility of witnesses lies within the exclusive province of the jury, which was in the best position to judge the credibility

of the witnesses in light of other evidence in the case. *See Graham*, 622 F.3d at 448. Thus, this Court cannot replace the assessment of a witness's credibility with its own.

Additionally, Singleton's assertion that the only evidence of a conspiracy came in the form of Dr. White and Dr. Marlow's testimony is simply incorrect. The jury heard testimony from a number of nurses and clerical employees, such as Nurse Sarah Agee, regarding Singleton's role at the clinic in scheduling patients, encouraging the physicians to see more patients, and even altering a prescription on occasion. Nurse Agee testified that employees other the physicians wrote prescriptions at the clinics and it was Dr. White's common practice to sign blank prescriptions so that she—as the nurse on duty at the clinic—would fill in the amount and type of medication before giving it to the patient. The jury also saw a document admitted into evidence as Government Exhibit 12 entitled, "Prescription Guidelines," which Nurse Agee testified was typed at the direction of Singleton. This document was posted in the clinic and patient rooms and included phrases such as, "No more than #120 Oxycodone 30's." The last line of this document stated, "No exceptions unless approved by Will!!!" The jury could logically infer from this document and all of the testimony presented that there was an agreement between Singleton and others to distribute controlled substances at the two pain clinics. By convicting Singleton, the jury obviously rejected his theory that it was only the physicians who were guilty of the conspiracy.

Singleton next argues for acquittal as to Counts 3–9 on the grounds that no evidence was introduced to support a finding of guilt. Counts 3–9 (the "aiding and abetting counts") allege that Singleton, aided and abetted by others, distributed and dispensed controlled substances "outside the scope of professional practice and not for a legitimate medical purpose." (DE 73). According to Singleton, "Each of the Aiding & Abetting Counts is premised upon the allegation that Mr. Singleton distributed or dispensed controlled substances on a specific date," and the government did not provide any evidence at trial to show that Singleton ever prescribed controlled substances

himself or that the prescriptions given on each specific date were outside the scope of legitimate medical purpose. (DE 215-1, at 5). Thus, according to Singleton, the evidence does not sustain a conviction for any of these counts.

Singleton's argument appears to be two-fold, although it is not clear exactly on which leg he attempts to stand. In his original motion, he argues that "[a]s a threshold matter, there was not one iota of evidence presented at trial that Mr. Singleton *ever* prescribed any controlled substances himself (nor could he, as he is not a physician)." (DE 215-1, at 5). The United States correctly responded by explaining that an aiding and abetting charge does not require that the defendant actually take the unlawful act. (DE 219, at 9). Rather, "[t]o be found guilty of the crime of aiding and abetting a criminal venture, a defendant must associate himself with the venture in a manner whereby he participates in it as something that he wishes to bring about and seeks by his acts to make succeed." *United States v. Phibbs*, 999 F.2d 1053, 1063 (6th Cir. 1993).

Without responding to this particular issue, Singleton wrote in his reply that "[t]he government misunderstands Mr. Singleton's argument with respect to the Aiding & Abetting Counts." (DE 229, at 4). According to Singleton, the "thrust" of his argument is that with respect to the *specific dates* alleged in Counts 3–9, the United States failed to present evidence demonstrating the prescriptions written were outside the scope of professional practice. Thus, according to Singleton, the issue is not whether he wrote the prescriptions himself, but whether the prescriptions written on the dates alleged in the Indictment were outside the scope of legitimate medical purpose.

The Court finds Singleton's arguments on this issue without merit. The government provided ample evidence from which a jury could conclude that the prescriptions written on these dates were outside the scope of legitimate medical purpose. To support Counts 3 and 4, Tim Dials testified as to his visit to the clinic where he received prescriptions of oxycodone despite limited

interaction with the physician, no meaningful physical examination, and a failure to consider the negative drug screens on his subsequent visits. The evidence was sufficient for a jury to conclude that the prescriptions provided to Dials were outside the scope of legitimate medical purpose.

The same is true for the prescriptions provided to Kimberly Preston, which were the bases for Counts 5–8. At trial, Detective Hector Alcala testified that Preston was a paid confidential informant who received prescriptions on November 17, 2011, December 15, 2011, January 12, 2012, and February 14, 2012. According to Alcala's testimony, Preston spent approximately half an hour with the doctor who determined that her MRI was normal. Despite this, Patterson was issued prescriptions for oxycodone. From this testimony and the prescriptions that were admitted into evidence, a rational trier of fact could conclude that these prescriptions were written outside the scope of a legitimate medical purpose.

Finally, with respect to Count 9, the government presented evidence that Shelaine Aydelott was given a prescription despite the fact that her visit with the physician lasted only three minutes, she received no physical examination, and the doctor informed her that the MRI did not justify her complaints about pain. While Singleton urges the Court to consider the contrary evidence—that she was first turned away by the clinic when her MRI did not show a significant injury or that her visit with other clinic staff extended beyond the three minutes—this is not a matter for the Court to decide. The question is whether the evidence would enable a rational trier of fact to make a finding of guilt beyond a reasonable doubt, and this Court is not permitted to weigh the evidence and substitute its own judgment for that of the jury. The evidence presented by the government meets this burden.

Although Singleton hedges away from his argument that he cannot be found guilty under Counts 3–9 without sufficient evidence that he knew or participated in the actual writing of prescriptions on the dates in question, the Court will briefly address this issue. In order to be

found guilty of aiding and abetting a criminal venture under 18 U.S.C § 2, Singleton "must associate himself with the venture in a manner whereby he participates in it as something that he wishes to bring about and seeks by his acts to make succeed." *Phibbs*, 999 F.2d at 1063. Singleton is *not required* to be present when the specific criminal acts occur. The evidence reviewed above demonstrates ample grounds for a jury to conclude that Singleton, through his ownership and operation of these clinics, associated with the criminal venture in order to bring about the unlawful acts the jury found to have been committed. Whether he knew about the specific prescriptions written on the specific days is immaterial to the charge, so long as the jury reasonably found that the physicians prescribed the drugs outside of the scope of legitimate medical practice and Singleton, through his association with the criminal venture, aided and abetted such acts. Thus, and for all of the reasons stated above, Singleton's motion for acquittal as to Counts 3–9 will be denied.

Next, Singleton argues for acquittal as to Count 11 due to the fact that the Court gave a general deliberate-ignorance instruction that is improper as applied to charges brought pursuant to 21 U.S.C. § 856(a)(1). Count 11, to which the parties refer as the "pill mill count," charged Singleton with knowingly and intentionally opening and maintaining a place for the purpose of distributing and dispensing, outside the scope of professional practice and not for a legitimate medical purpose, a quantity of pills containing controlled substances in violation of 21 U.S.C. § 856(a)(1). Drawing on case law from the Fifth Circuit, Singleton argues that one cannot be both deliberately ignorant of the unlawful conduct occurring at his clinics while also maintaining and operating them for the purpose of such unlawful activities. That is to say, according to Singleton, the mens rea of purpose under § 856(a)(1) is incompatible with a finding of deliberate ignorance, and it was therefore error to instruct the jury otherwise.

Singleton's motion for acquittal as to this count is improper. A motion under Rule 29 challenges the sufficiency of the evidence to sustain a guilty verdict. *See* Fed. R. Crim. P. 29(a), (c). The question is "whether, after viewing the evidence in a light most favorable to the government, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Gardner*, 488 F.3d 700, 710 (6th Cir. 2007). In arguing that the deliberate-ignorance instruction was improper, Singleton does not challenge the sufficiency of the evidence to sustain the conviction. Even if this Court were to find that the instruction was improper, acquittal pursuant to Rule 29(c) is not the appropriate relief.

At the close of the government's case, however, Singleton did move for acquittal as to Count 11 based on an insufficiency-of-the-evidence argument. The Court reserved ruling on this motion. (DE 210). Although Singleton did not discuss this motion in his written renewed motion for acquittal, the Court will address it now. The Court finds that in viewing the evidence in the light most favorable to the government, a rationale trier of fact could find Singleton guilty beyond a reasonable doubt under Count 11. Singleton argued in his motion that the government failed to present evidence demonstrating he opened and maintained these clinics for the purpose of dispensing controlled substances. On the contrary, the government presented substantial evidence from which a juror could find such a purpose. Testimony from employees, criminal informants, former employees, and law enforcement all supported a finding that Singleton maintained these clinics for the purpose of dispensing controlled substances. This evidence demonstrated that Singleton was closely involved in overseeing the operations of the clinic, demanded the physicians increase their patient load, and set his own guidelines for the physicians with regard to prescribing medication. Evidence such as the patient attestation form and the fact that Singleton openly carried firearms would lead a reasonable trier of fact to conclude Singleton's purpose in operating these clinics was to violate the law. The evidence presented by the government at trial

supported a finding of guilt beyond a reasonable doubt and Singleton's motion for acquittal as to Count 11 will therefore be denied.

Finally, Singleton moves the Court for acquittal as to Counts 12, 13, 15, and 17 through 23— the money laundering counts—on the grounds that if the money was not unlawfully obtained there can be no money laundering. He points to the reasons articulated throughout the rest of motion for acquittal to support the contention that the money was not unlawfully obtained. Because this Court has rejected Singleton's claim that "no unlawful activity occurred," his motion for acquittal as to these counts will be denied.

## III.

Singleton also moves for a new trial. (DE 216). In making his motion, he offers two alternative bases for such relief: (1) that there were cumulative errors so prejudicial as to render the trial fundamentally unfair, and (2) that the jury's verdict is against the manifest weight of the evidence. The Court finds that both arguments are without merit and will deny the defendant's motion.

When examining a defendant's motion for a new trial, the court "may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). "The decision whether to grant a new trial is left to the sound discretion of the district court." *United States v. Pierce*, 62 F.3d 818, 823 (6th Cir. 1995). "A district judge, in considering the weight of the evidence for purposes of adjudicating a motion for new trial, may act as a thirteenth juror, assessing the credibility of witnesses and the weight of the evidence." *United States v. Hughes*, 505 F.3d 578, 593 (6th Cir. 2007) (citing *United States v. Lutz*, 154 F.3d 581, 589 (6th Cir. 1998)). Moreover, "it is widely agreed that Rule 33's 'interest of justice' standard allows the grant of a new trial where substantial legal error has occurred." *United States v. Munoz*, 605 F.3d 359, 373 (6th Cir. 2010).

## A. Cumulative Error

Singleton claims that cumulative errors at trial denied him due process of law. Errors that appear harmless in isolation may cumulatively amount to a denial of due process. *Walker v. Engle*, 703 F.2d 959, 963 (6th Cir. 1983). The first of these alleged errors pertains to a videotape recording of an office visit by criminal informant Kimberly Preston that was not played at trial nor admitted into evidence (Def. Ex. 45). Preston was on the government's witness list but was not called as a witness at trial. Instead, and as explained above, Detective Alcala testified as to Preston's visit, which lasted approximately thirty-five minutes. Although Singleton cross-examined Alcala about the length of Preston's visit, he did not move to introduce the videotape during cross *nor* during his case-in-chief. It was only at the close of his proof that Singleton moved to admit the videotape.

According to Singleton, the parties in this case had a pre-trial agreement under which they stipulated to pre-admitting certain pieces of evidence—including this videotape. Because this videotape was pre-admitted pursuant to this agreement, Singleton did not believe they needed to call a custodial witness to testify as to as to its contents. Rather, it was Singleton's intent to move for admission of this videotape along with other evidence at the close of his case-in-chief so that it may be used for its closing argument, despite the fact that the evidence had not been presented at all to the jury during the defendant's presentation of its proof or on cross examination of government witnesses.

This Court denied Singleton's request to admit the videotape into evidence because it had not been presented to the jury despite the defendant having multiple opportunities to do so. As the Court said at the time, the purpose of the pre-admission process was to save time in the presentation of proof. In order for the jury to consider a piece of evidence, however, the evidence must have been presented to them and subjected to cross examination It would be both confusing

and unfair to permit either side to argue about the contents of evidence that the jury never saw during the trial.

Singleton argues that the exclusion of this videotape "left the defense *without any way to challenge a central tenet* of the government's theory of the case: namely, whether enough time was spent with patients to evaluate them before prescriptions were issued." (DE 216-1, at 7) (emphasis added). Admission of this video "would have shown that the government's theory that all visits were less than fifteen minutes long *was just not true*." (DE 216-1, at 6) (emphasis in original).

The Court finds these arguments disingenuous. It's simply incorrect that the defense had no method in which to rebut the government's narrative that the visits were all less than fifteen minutes long. In fact, Alcala testified during the defendant's cross-examination that Preston's visit lasted approximately half an hour. To represent to the Court that the defense was "without any way to challenge a central tenet of the government's theory of the case" ignores Singleton's own evidence obtained through cross-examination regarding the length of Preston's visit. The fact that the videotape was excluded does not mean that Singleton had *no method* in which to rebut the government's case regarding the general length of patient visits—and in fact, Singleton successfully presented rebuttal evidence on this very issue. Even if it was error to exclude the videotape when Singleton failed to present it to the jury, the defendant had ample opportunity—on which he capitalized—to present evidence of the length of Preston's visit to the jury.

The second error raised by Singleton regards Government Exhibit 21, which was a document with physical holes cut in it that the government used to prove Singleton altered medical records. According to Singleton, the United States did not comply with the notice requirement of Federal Rule of Criminal Procedure 16(a) when it produced this document electronically without notifying the defendant that it had been physically altered. The electronic production of this document— among thousands of documents—did not adequately indicate how it had been physically altered,

and therefore looked like nothing more than an ordinary patient record with information redacted. To make his argument, Singleton relies on a California district court case, *United States v. Salyer*, 2010 WL 3036444, Cr. No. S-10-0061 (E.D. Cal. Aug. 2, 2010) (unpublished), which held that "the government cannot meet its *Brady* obligations by providing [the defendant] with access to 600,000 documents and then claiming that [the defendant] should have been able to find exculpatory information in the haystack." *Id.* at *6. But nothing in this case indicates—including Singleton's argument—that the government failed to meet its obligations under *Brady v. Maryland*, 373 U.S. 83 (1963). The court in *Salyer* analyzed the duties of the prosecution in identifying for the defense any *Brady* material within the hundreds of thousands of documents it produced during discovery. The present issue does not involve *Brady*, does not involve exculpatory evidence, and the analysis in *Salyer* is simply irrelevant.

The government admits that this case involved voluminous documents, but in its proposed exhibit list dated May 1, 2013, it listed this document as an exhibit to be used at trial and pointed to the file where this document was located. Moreover, this document was *seized from the defendant's storage shed*. It was Singleton's document and he was "in the best position to know what [it] contain[ed]." *United States v. Ogden*, 2008 WL 2247074, at *13, No. 06-20033 (W.D. Tenn. May 28, 2008) (citing *United States v. Birrell*, 269 F. Supp. 716, 722 (S.D.N.Y. 1967)). Defense counsel was clearly on notice that this document would be used: it was produced for the defense and it was listed on the exhibit list. The United States indicated its intent to prove that Singleton altered medical records, and this document was in Singleton's possession when it was seized by the government. There is no error here.

The third error Singleton alleges is this Court's decision to exclude the audio of a video recording presented at trial. The video recording evidence was offered for the purpose of demonstrating the volume of individuals who drove in and out of the parking lot and who went

into the clinic. The audio portion of the tape contained only a conversation between officers conducting the surveillance. Upon reviewing the tape, the Court concluded that the officers' conversation had no relevance to the case. The officers' conversation was rude and derogatory of those they observed going into the clinic, but it shed no light on the facts captured in the video. (DE 171). At trial, the Court permitted the United States to play the surveillance video without the accompanying irrelevant audio. Singleton argues that he should have been permitted to play the audio to impeach Alcala's credibility and show bias. As stated before, although it contained unkind statements about patrons of the clinic, the audio portion of the recording had absolutely no bearing on this case or the validity of the images captured in the video, which was used solely to identify the criminal informants as they made visits to various clinics. Nothing about the profanity and offensive nature of the officer's comments relates to this case. *See United States v. Tocco*, 200 F.3d 401, 420 (6th Cir. 2000) (expressing, concern over "certain remarks of a racial nature that were made in the conversations that should have been excised from the tapes"). The fact that Alcala might be unkind or engage in the offensive use of profanity does not speak to the contents of the video or the accuracy of what it depicted.

Singleton also argues it was error for the Court to allow references to Singleton's use or possession of firearms given that this was not a "street" drug case but a pill-mill case. Through a pre-trial motion *in limine* (DE 106), Singleton asked the Court to exclude any evidence of or reference to firearms during the trial. The Court denied the motion upon determining that the firearms evidence was admissible because it demonstrated Singleton's knowledge that the clinics and its patients were not legitimate. The Court determined that Singleton's own personal carrying of a weapon at the clinics could be viewed as a source of intimidation, and that it was a common "tool of the trade." Numerous witnesses at trial testified that it was Singleton's regular practice to

walk around the clinic with a gun on his hip and his possession of a firearm at the clinic was a source of intimidation. Thus, the evidence was relevant to the crimes charged.

Singleton next argues that despite three weeks of trial, the government failed to address his primary defense—his ongoing assistance to law enforcement to catch "pill shoppers"—until the final few moments of rebuttal during closing argument. In order to rebut the argument that Singleton cooperated with law enforcement, the prosecutor argued that Singleton's assistance to local law enforcement was a ruse and that Detective Don Mather, the liaison between the clinic and the police, was a patient at Singleton's clinic. The defendant contends that these statements by the prosecutor were improper as they were not supported by the evidence at trial.

The Sixth Circuit employs a two-pronged test when reviewing a claim of prosecutorial misconduct: "First, [the court] determine[s] whether the prosecutor's conduct or comments were improper. Second, [the court] determine[s] whether the impropriety amounts to reversible error." *United States v. Talley*, 194 F.3d 758, 764 (6th Cir. 1999) (quoting *United States v. Long*, 190 F.3d 471, 477–78 (6th Cir. 1999)). *See also United States v. Watts*, 2008 WL 449983, No. 07-5330 (6th Cir. February 20, 2008) (unpublished). The Court considers four factors in determining whether a statement warrants the grant of a new trial: "(1) whether the prosecutor's remarks or conduct tended to mislead the jury or prejudice the defendant; (2) whether the remarks were isolated or extensive; (3) whether the remarks were accidentally or deliberately made; and (4) the overall strength of the evidence against the accused." *United States v. Henry*, 545 F.3d 367, 376 (6th Cir. 2008). Courts "afford wide latitude to a prosecutor during closing argument, analyzing disputed comments in the context of the trial as a whole and recognizing that inappropriate comments alone do not justify reversal where the proceedings were 'otherwise fair.'" *Id.* (quoting *United States v. Young*, 470 U.S. 1, 11 (1985)).

After reviewing the testimony, the Court finds that the prosecutor's reference to Detective Mather in his closing argument was proper. Undercover agent Tim Dials testified that federal law enforcement did not want to involve local police in its investigation for fear that it might be compromised. To illustrate the basis of the investigator's fears, the government presented evidence that Detective Mather was a patient at the Georgetown clinic. Also, the defense put forward evidence, including a newspaper article, in which Singleton expressed his efforts to catch so-called "pill shoppers." The jury members were then left to draw their own conclusions regarding the legitimacy of Singleton's attempts to prevent pill-shopping, and the statements by the prosecutor during rebuttal were not improper. Moreover, the Court specifically instructed the jury that arguments and statements by the lawyers are not evidence. (Jury Instruction No. 3, DE 200, at 4). Although Singleton argues that he "was deprived of any avenue by which to counter critical evidence presented against him" because of the timing of the prosecutor's remarks (DE 228, at 15), this argument rings hollow. If Singleton was inappropriately harmed *due to his inability to respond* to the statement, it's unclear as to why he failed to object at the time of the prosecutor's remarks.

Finally, Singleton argues it was error for the jury to be given a "deliberate ignorance" instruction with regard to Count 11. This argument is the same as that advanced in his motion for acquittal, which the Court denied above as brought within the context of Rule 29(c). Essentially, Singleton argues that the Court erred in giving a general instruction regarding deliberate ignorance that did not limit its applicability so as to exclude Count 11. The instruction given stated the following:

> No one can avoid the responsibility for a crime by deliberately ignoring the obvious. If you are convinced that a defendant deliberately ignored a high probability *that others were dispensing controlled substances without a legitimate medical purpose and outside the usual course of medical practice*, then you may find that he

> knew that others were issuing controlled substances without a legitimate medical purpose and outside the usual course of medical practice.
>
> But to find this, you must be convinced beyond a reasonable doubt that a defendant was aware of a high probability that others were issuing controlled substances without a legitimate medical purpose and outside the usual course of medical practice, and that a defendant deliberately closed his eyes to what was obvious. Carelessness, or negligence, or foolishness on his part is not the same as knowledge, and it is not enough to convict. This, of course, is all for you to decide.

(DE 200, Instruction No. 12, at 14) (emphasis added). This instruction was not tied to any specific count charged, but instead generally instructed the jury that—if necessary—they may find that Singleton had the requisite knowledge for a charge by finding him deliberately ignorant. Importantly, this instruction is not directed at *any* knowledge that *any* charge might require. Rather, it specifies that the jury may find Singleton had knowledge that "others were dispensing controlled substances without a legitimate medical purpose and outside the usual course of medical practice" if the standard of deliberate ignorance is met. Thus, if a charge requires Singleton to have a different piece of knowledge, Instruction No. 12 by its own terms would not apply.

Singleton contends that this instruction was improper as applied to Count 11 because one cannot be both deliberately ignorant of the unlawful conduct occurring at his clinics while also maintaining and operating them for the purpose of such unlawful activity. That is to say, according to Singleton, the mens rea requirement of purpose under § 856(a)(1) is incompatible with a finding of deliberate ignorance and it was therefore error to instruct the jury otherwise.

A court's choice of jury instructions is reviewed for abuse of discretion. *United States v. Ross*, 502 F.3d 521, 527 (6th Cir. 2007). "A trial court has broad discretion in crafting jury instructions and does not abuse its discretion unless the jury charge 'fails accurately to reflect the law.'" *Id.* (quoting *United States v. Layne*, 192 F.3d 556, 574 (6th Cir. 1999)). To prevail on his motion,

18

Singleton must demonstrate that "the instructions, viewed as a whole, were confusing, misleading, or prejudicial." *United States v. Harrod*, 168 F.3d 887, 892 (6th Cir. 1999) (quoting *Beard v. Norwegian Caribbean Lines*, 900 F.2d 71, 72–73 (6th Cir. 1990)). Under this standard, the Court finds no error in the deliberate-ignorance instruction given to the jury.

Section 856(a)(1) requires proving that Singleton knowingly and intentionally maintained his clinics for the purpose of dispensing controlled substances. This knowledge element in § 856(a)(1) differs from that referred to in the general instruction. The instruction explained to the jury that in determining whether Singleton had knowledge that others were dispensing controlled substances without a legitimate medical purpose and outside the usual course of medical practice they may consider whether he was deliberately ignorant as to this fact. But § 856(a)(1) requires a different type of knowledge, which is that Singleton knowingly operated his clinic for the purpose of unlawfully distributing controlled substances. Contrary to Singleton's claim, the deliberate-ignorance instruction was not directed at the § 856(a)(1) charge because the knowledge it refers to is different than that described in Count 11. Singleton could reasonably be found to have knowingly operated his clinic for the purpose of dispensing controlled substances and done so by turning a blind eye toward the practices of others who worked at the clinic. Deliberate ignorance as to what the physicians did is not incompatible with a finding that Singleton purposefully operated his clinics so as to violate the law.

Moreover, when analyzing a conspiracy charge requiring a similar element of intent, the Sixth Circuit Court of Appeals found that giving a general deliberate-ignorance instruction was not an error. In *United States v. Williams*, 612 F.3d 500 (6th Cir. 2010), the defendant was convicted of a conspiracy charge where the jury was instructed that it must prove he "voluntarily joined [the conspiracy], intending to help advance or achieve its goals." *Id.* at 507. The mens rea was strikingly similar to that found in § 856(a)(1), as it required the jury to determine the defendant

19

had knowledge of the conspiracy and that he joined it with the intent to achieve its unlawful purpose. The defendant argued that a deliberate-ignorance instruction should not have been given because it allowed the jury to find that the defendant voluntarily joined the goals of the conspiracy despite deliberately ignoring that the conspiracy exists. The Court of Appeals rejected this argument, noting that the general instruction as to deliberate ignorance explained only the degree of knowledge required by the defendant, which had no bearing on whether the defendant also had the intent necessary to convict. Just as in *Williams*, a general instruction as to deliberate ignorance does not contradict the instructions given as to Count 11 that required the jury find that Singleton operated his clinics "for the purpose of manufacturing, distributing, or dispensing controlled substances outside the scope of professional practice and not for a legitimate medical purpose." (DE 200, Instruction No. 19, at 24).

Even if this instruction was given in error, the error would be harmless. When a deliberate-ignorance instruction is improperly given but the evidence at trial overwhelming supports a finding of actual knowledge, such error is harmless. *See United States v. Ramos*, 38 F.3d 1217, 1994 WL 560870, at *5, No. 93-6196 (6th Cir. Oct. 12, 1994) (unpublished) (explaining that the deliberate ignorance instruction was "surplusage" which did not create risk of prejudice); *United State v. Concha*, 233 F.3d 1249, 1252–53 (10th Cir. 2000); *United States v. Sasser*, 974 F.2d 1544, 1553 (10th Cir. 1993) ("[W]hen sufficient evidence of a defendant's guilt exists, the tendering of a 'willful blindness' instruction is harmless beyond a reasonable doubt even when the government does not introduce evidence to support such a theory.").

In this case, as discussed above, there was overwhelming evidence that Singleton had actual knowledge of the practices and procedures at his two clinics. Eileen Fowler testified as to her statement to Singleton that the Grant County clinic "would not be another pill mill," and that this statement went unanswered by Singleton. Tonya Mynear stated Singleton was aware of what was

going on at the clinics and encouraged the doctors to see more patients. Christie Martin stated that a doctor told her that if you don't give the patients what they want then the patients won't come back. Nurse Agee stated that Singleton instructed her to draft and type the Prescription Guidelines presented as evidence at trial, and that Singleton was the owner, operator, and ultimate intimidator at the two clinics. The evidence of how the defendant ran the two clinics and his actual knowledge of the practices and prescribing methods was ample. Thus, even if the deliberate-ignorance instruction was given in error, the error would be harmless in light of the overwhelming evidence of Singleton's actual knowledge with regard to Count 11.

Because none of these claims by Singleton constituted error, cumulatively they do not require a new trial. *See Campbell v. United States*, 364 F.3d 727, 736 (6th Cir. 2004) ("[T]he accumulative of non-errors cannot collectively amount to a violation of due process.").

## B. Verdict against Manifest Weight of the Evidence Analysis

Singleton's alternative argument for a new trial—that the verdict is against the manifest weight of the evidence—is similarly without merit. Contrary to the claims made by Singleton, the Court concludes that the evidence presented at trial overwhelmingly supported the jury's verdict.[1]

Singleton argues that the only evidence against him with regard to the conspiracy charges in Counts 1 and 2 was the testimony of Dr. Lea Marlow, and that her testimony is too incredible to convict him. He states that this lack of credibility arises from the fact that Marlow's prior testimony to the medical licensing boards contradicted her testimony at trial and Marlow admitted to entering into a plea agreement with the United States in exchange for her testimony.

Even if Dr. Marlow lacked credibility, her testimony was corroborated by other witnesses—including law enforcement, confidential informants, and other employees of the clinic. Conspiracy

---

[1] The Court notes that pursuant to the prior analysis, Singleton is entitled to acquittal as to Count 10 and the Court need not rule on whether he would be entitled to a new trial.

"may be inferred from relevant and competent circumstantial evidence, such as acts of the conspirators themselves." *United States. Milligan*, 17 F.3d 177, 183 (6th Cir. 1994). For example, she admitted on the stand that she had a formal license plate made with the name, "Regina Titula," which means, "Pill Queen." She also stated on the stand that she "felt like a whore" for writing so many prescriptions for oxycodone. She stated she was guilty of writing prescriptions for narcotics for patients without giving them a full medical exam. She felt overloaded with patients, but she felt she had no control over patient scheduling. She admitted her common practice was to prescribe a cocktail of medicines that included oxycodone, neurotin, and valium and that she wrote these prescriptions regardless of the patient's symptoms "99 percent of the time."

In viewing all of the evidence presented at trial, and assessing the credibility of the witnesses in the role of the "thirteenth juror," the Court cannot find that the evidence is so heavily against the jury's verdict. Certainly it's true that Dr. Marlow's credibility was challenged by the fact that she gave inconsistent testimony to the medical licensing boards and that she may receive more leniency at her sentencing because of the plea agreement. The government, however, argues that at the time she gave her testimony to the medical licensing boards she still had hope of keeping her license. All of this evidence was presented to the jury for consideration, and in light of the circumstantial evidence provided by other employees such as Nurse Sarah Agee and Tonya Mynear, the Court does not find that Marlow's testimony was so incredible that it would require a different verdict.

With regard to Counts 3–9, the aiding and abetting counts related to the distribution of narcotics outside the scope of professional practice and not for a legitimate medical purpose, Singleton argues that the Court must grant a new trial because the manifest weight of the evidence fails to show that he committed any act that could be construed as assisting physicians in

distributing controlled substances unlawfully and there was no evidence of his intent to aid in the commission of the crime because he made the same amount of money on each patient.

To sustain a conviction for aiding and abetting, the government must prove that the defendant was either a principal or an aider and abettor. *United States v. Samuels*, 308 F.3d 662, 666 (6th Cir. 2002). "[T]he essential elements of aiding and abetting are (1) an act by the defendant that contributes to the commission of the crime, and (2) an intention to aid in the commission of the crime." *United States v. Graham*, 622 F.3d 445, 450 (6th Cir. 2010) (quoting *United States v. Davis*, 306 F.3d 398, 412 (6th Cir. 2002)). The evidence at trial established the Singleton aided and abetted the physicians at the two clinics in distributing narcotics outside the scope of professional practice and not for a legitimate medical purpose. Although the defendant consistently maintains that he tried to get rid of "pill seekers," the evidence supports the opposite conclusion. The confidential informants and former patients at the clinics testified that the waiting rooms were crowded, the patients often appeared impaired, and that they were required to pay cash up front before seeing the doctor. The confidential informants were provided with a fictitious MRI that showed little back impairment, but were nonetheless prescribed a "cocktail" of narcotics. Patients' visits were extremely short and doctors often performed no physical examination at all. Even though some patients were dismissed from the clinic, Singleton himself was described as saying, "You can't dismiss them all."

Furthermore, other evidence in the record supports the conclusion that prescriptions for narcotics from the two pain clinics were issued not for a legitimate medical purpose. Contrary to the defendant's argument, the fact that he made the same amount of money on each visit does not indicate a lack of intent to illegally distribute narcotics. Rather, the evidence at trial overwhelming established that Singleton's aim was to create a high-volume business, often triple-booking patients for the same time period, and the doctors were told—indeed *threatened*—to see as many

patients as possible. For example, Dr. White testified that at one point as many as 60–90 patients were seen on one day. Dr. Amy Coleman testified that she only worked at the Georgetown clinic for two days before she quit because she was overwhelmed by the number of patients she was scheduled to see and felt that she couldn't spend the necessary time with each patient. Dr. Marlow testified that while employed at the clinics she was also overwhelmed by the number of patients, was not permitted to take lunch breaks, and knew that she was writing prescriptions for narcotics that lacked a legitimate medical purpose. All of these doctors testified that they had no control over the scheduling of patients and that defendant Singleton, as the owner of the clinic, was in charge of the workload and instructed them to see patients as quickly as possible. The evidence overwhelmingly supports the conclusion that Singleton had the intent to illegally distribute narcotics outside the scope of professional practice and not for a legitimate medical purpose, and that he accomplished this task through the control and operation of his clinics.

Singleton next argues that his conviction under Count 11, for knowingly and intentionally operating his clinics for the purpose of distributing and dispensing, outside the scope of professional practice and not for a legitimate medical purpose, a quantity of pills containing controlled substances, in violation of § 856(a)(1), is against the manifest weight of the evidence. He contends that the evidence here is lacking for the same reasons he believes it is lacking for Counts 3–9. Singleton argues that the evidence simply cannot sustain a conviction because the efforts he took to dismiss and report pill-seekers demonstrates that he lacked the requisite "purpose" under § 856(a)(1).

The Court finds that as with Counts 3–9, the evidence in this case clearly supports a conviction under Count 11 for violating 21 U.S.C. § 856(a)(1). The jury heard evidence that Singleton made statements to Eileen Fowler, Dr. Godofsky, Tonya Mynear, and John David Morgan that all support the inference that Singleton was not serious about stopping pill-shoppers and believed he

24

was untouchable so long as the physicians were writing the prescriptions. The government also presented evidence to demonstrate Singleton's intent to maintain his clinics so as to unlawfully dispense controlled substances, such as the Prescription Guidelines he posted at the clinic; the way in which he required physicians to increase their patient loads; his involvement in how patients were scheduled; his use of cash and no-refund policy; allowing prescriptions to be filled only at certain pharmacies; the Attestation form patients were required to sign; the supervision and oversight he exercised at the clinics; the use of devices to detect wire transmissions; and his visible display of firearms while he was working at the clinic. This summary includes only some of the evidence the jury heard that would lead to the reasonable conclusion that Singleton knowingly and intentionally operated these clinics with the purpose of dispensing controlled substances, and such a finding is not against the manifest weight of the evidence.

Finally, with respect to the money laundering charges in Counts 12, 13, 15, and 17–23, the Court finds that the evidence supports Singleton's convictions. IRS Special Agent Jeff Sagrecy provided detailed testimony regarding the various bank accounts held by Singleton and traced the proceeds of the money from the clinic to various purchases of real estate, farm equipment, livestock, and more. Although the defendant argues that no unlawful activity occurred and therefore no money laundering could occur, the Court disagrees. As the analysis and discussion above indicates, the evidence at trial overwhelming supports the conclusion that Singleton operated these clinics in a manner so as to routinely prescribe narcotics to patients regardless of their needs and outside of any legitimate medical purpose. Consequently, the Court will deny Singleton's motion for a new trial.

* * *

Accordingly, and for all of the above-stated reasons, **IT IS ORDERED** that

1. The defendant's motion for acquittal (DE 215) is **GRANTED** with respect to Count 10 and the motion is otherwise **DENIED**; and

2. The defendant's motion for a new trial (DE 216) is **DENIED**.

   Dated his 29th day of April, 2014.

KAREN K. CALDWELL, CHIEF JUDGE
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY